PINGREE v. AUDITOR GENERAL.

TECUMSEH TELEPHONE CO. v. SAME.

| 120 | 95 |
|-----|------|
| 125 | 490 |
| 125 | 493 |
| 125 | 496 |
| 120 | 95 |
| s78NW | 1025 |
| 130 | [2]475 |
| 120 | 95 |
| 139 | [2] 8 |
| 120 | 95 |
| 145 | [1]419 |
| 120 | 95 |
| 156 | [3]234 |

1. TAXATION—TELEGRAPH AND TELEPHONE LINES—SPECIFIC TAX.
   The tax provided for by Act No. 168, Pub. Acts 1881 (1 How. Stat. § 1237 et seq.), requiring telegraph and telephone companies to pay, in lieu of all other taxes, a tax levied upon an assessment of such lines at their true cash value, is an ad valorem, not a specific, tax.

2. SAME—UNIFORMITY.
   The rate of taxation provided by the act—being the average rate of all general, municipal, and local taxes levied throughout the State during the previous year—is determined in a different way, and is different in amount, from that imposed upon other property bearing the same relation to the State, and the act is therefore obnoxious to article 14, § 11, of the Constitution, which requires uniformity in taxation.

3. CONSTITUTIONS—PRACTICAL CONSTRUCTION.
   The rule of construction by long and continued usage should be applied cautiously, and only in cases of doubt, to a provision of the Constitution.

*Mandamus* by Hazen S. Pingree, governor, to compel Roscoe D. Dix, auditor general, to transfer to the general fund, from the primary-school fund, certain moneys collected for taxes under Act No. 168, Pub. Acts 1881.

*Mandamus* by the Tecumseh Telephone Company to compel the auditor general to cancel certain taxes assessed against it under the above-mentioned act.

Submitted March 18, 1899.   Writs granted April 26, 1899.

*Charles D. Joslyn* ( *Benton Hanchett, Charles Flowers,* and *Ashley Pond,* of counsel ), for relator Hazen S. Pingree.

*Carey W. Dunton* ( *Benton Hanchett, Charles Flowers,* and *Ashley Pond,* of counsel ), for relator Tecumseh Telephone Co.

*Horace M. Oren,* Attorney General (*Alfred Russell, Henry M. Cheever,* and *John J. Speed,* of counsel ), for respondent.

HOOKER, J. In the year 1881 the legislature passed an act ( No. 168, Pub. Acts 1881; 1 How. Stat. § 1237 *et seq.*) entitled "An act to provide for the assessment and taxation of telegraph and telephone lines within the State of Michigan." Its provisions are, in substance, that the auditor general, state treasurer, and commissioner of the state land office shall assess telegraph and telephone lines at their true cash value, and levy a tax upon said assessment at a rate which shall equal the average rate of taxes ( general, municipal, and local ) levied throughout the State during the previous year, to be ascertained from the records and files of the auditor general's office, which tax shall be in lieu of all other taxes. This tax has since been paid, and the auditor general has treated it as a specific tax, and credited the amounts collected to the educational fund, under the provisions of section 1 of article 14 of the Constitution, which provides:

"All specific state taxes, except those received from the mining companies of the Upper Peninsula, shall be applied in paying the interest upon the primary-school, university, and other educational funds, and the interest and principal of the state debt, in the order herein recited, until the extinguishment of the state debt, other than the amounts due to educational funds, when such specific taxes shall be added to and constitute a part of the primary-school interest fund. The legislature shall provide for an annual tax, sufficient, with other resources, to pay the estimated expenses of the state government, the interest of the state debt, and such deficiency as may occur in the resources."

The application of the governor is for a *mandamus* to compel the auditor general to transfer to the general fund, from the primary-school fund, the amount of moneys collected under the act mentioned, and now on hand, upon the ground that the tax provided in said act is not a specific tax. The Tecumseh Telephone Company's application is based upon the same ground, and asks that the tax be canceled, upon the further contention that the tax, not being a specific tax, is not levied in conformity to other provisions of the Constitution, viz., sections 11 and 14 of article 14, which are as follows:

"SEC. 11. The legislature shall provide an uniform rule of taxation, except on property paying specific taxes, and taxes shall be levied on such property as shall be prescribed by law."

"SEC. 14. Every law which imposes, continues, or revives a tax shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

The auditor general has answered both petitions; claiming that the tax is specific, and not a property tax, and that, if it be determined otherwise, the tax is valid.

In addition to the sections quoted, sections 10 and 12 of article 14 of the Constitution are as follows:

"SEC. 10. The State may continue to collect all specific taxes accruing to the treasury under existing laws. The legislature may provide for the collection of specific taxes from banking, railroad, plank-road, and other corporations hereafter created."

"SEC. 12. All assessments hereafter authorized shall be on property at its cash value."

The first question presented, then, is, Does Act No. 168 of the Public Acts of 1881 provide for a specific tax, within the meaning of the Constitution? If it does, it disposes of the cases, and both applications should be denied.

Amasa Walker, in his Science of Wealth, at page 339, says that: "Duties are generally of two kinds,—specific and *ad valorem.* Specific duties are imposed by the

pound, yard, gallon, etc." The late Mr. Justice Cooley, in his work on Taxation (2d Ed., p. 238), uses a similar classification as to taxes, and says of specific taxes that:

"Under this head may be classed those which impose a specific sum by the head or number, or by some standard of weight or measurement, and which require no assessment beyond a listing and·classification of the subjects to be taxed."

He describes *ad valorem* taxes as follows:

"*Ad Valorem Taxes.* A large proportion of the duties on imports are of this description, and so, sometimes, are many of the taxes which make up the internal revenue. The statute laying them prescribes the rule, but requires the action of appraisers in apportioning them between individuals. By far the larger proportion of all state taxation is also upon property by a valuation, and effect can only be given to it by means of assessors, who value the property, and apportion the tax by their estimate."

A similar description of specific taxes is found in 25 Am. & Eng. Enc. Law, 17, note 3.

In Colton's Public Economy, at page 510, it is said:

"A specific duty is assessed by measure,—as so much per yard, per gallon, per cwt., per caldron, etc.; the instrument of measure being such as the nature of the article requires."

Perry, in his Principles of Political Economy, at page 557, says:

"What is the difference between specific and *ad valorem* taxes, and why should the student take careful note of these, both singly and combined? These terms are used more particularly in relation to tariff taxes, but there is nothing in the distinction itself so to limit its application. A specific tax is a tax of so many cents or dollars on the pound, yard, gallon, or other quantity measurable. An *ad valorem* tax is a tax of so much per centum on the invoiced or appraised money value of the goods subject to the tax."

Bouv. Dict. says:

"*Ad Valorem.* (Lat.) According to the valuation.

Duties may be specific or *ad valorem.* *Ad valorem*
duties are always estimated at a certain per cent: on the
valuation of the property."

Black's definition is:

"*Ad Valorem.* According to value. Duties are either
*ad valorem* or specific,—the former when the duty is laid
in the form of a percentage on the value of the property;
the latter where it is imposed as a fixed sum on each article
of a class, without regard to its value. The term ' *ad*
*valorem* tax ' is as well defined and fixed as any other
used in political economy or legislation, and simply means
a tax or duty *upon the value of the article or thing*
*subject to taxation.*"

Black, Tax Titles, § 83, says upon the subject that:

" *Difference between Specific and Ad Valorem Taxes.*
In regard to specific taxes, no other apportionment is
requisite than that necessarily prescribed by the statute
which lays the tax. The share of each taxpayer is com-
pletely determined by his condition with reference to the
number of the given articles in his possession, or their
weight or measurement, or with reference to the fact of
his pursuing the particular avocation taxed, or enjoying
the particular franchise, or otherwise, as the case may be.
But the case is different with respect to *ad valorem* taxes.
Here the intervention of ministerial officers is necessary to
effect the apportionment between individuals. Assessors
are called upon to estimate the value of the property to be
taxed, and apportion the shares according to their valua-
tion." .

This distinction has been recognized as applied to duties
for many years. Benton's Thirty Years in Congress says
of the customs act of 1833:

"Specific duties had been the rule, *ad valorem* the
exception; from the beginning of the collection of the
custom-house revenue. The specific duty was a question
in the exact sciences, depending upon a mathematical
solution by weight, count, or measure."

In *Gibbons* v. *Ogden,* 9 Wheat. 188, Chief Justice
Marshall said:

"The framers of the Constitution, and the people who

adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."

Quoting this language, Judge Cooley, in his Constitutional Limitations, said at page 73 (6th Ed.):

"This is but saying that no forced or unnatural construction is to be put upon their language, and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often, by interested subtlety and ingenious refinement, to induce the courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to re-declare this fundamental maxim."

It is urged that the framers of the Constitution used the term "specific tax" in a different and broader sense, and that, in contradistinction to the uniform tax contemplated by section 11, it should be construed to mean any tax on property not conforming to such uniform rule. We have only to examine the statutes in force at the time the Constitution was adopted, to see that the term "specific tax" was known and applied in this State previous to the meeting of the constitutional convention. Title 5 of the Revised Statutes of 1846 is divided into chapters 20 and 21. The former treats of the "Assessment and Collection of Taxes;" the latter, of "Specific State Taxes and Duties," —thus indicating that specific taxes and duties embraced taxes other and different from those ordinary taxes which were provided for in chapter 20, and which were assessed and collected locally. An examination of chapter 21 will show that the term "specific taxes" was used in conformity to the definitions above given. Thus banks were taxed a specified per centum upon the amount of capital stock paid in. A similar tax was imposed upon railroad, canal, and turnpike companies. These taxes were payable to the state treasurer. It will be noticed that they were not based upon the actual value of the real and personal property in possession of the companies at the time, but upon the amount of capital that had been previously

invested in their business. The interposition of no assessing officer was required to value the property. Reports to the state treasurer were required (see Rev. Stat. 1846, tit. 10, chap. 55, § 24); and presumably he was to determine the amount, and collect the tax, after making a deduction from the amount of capital stock equal in amount to such property, real and personal, of the banks, as was locally assessed and taxed. The legislatures of 1846 to 1849, inclusive, passed many acts—some general and some special—imposing taxes of this kind upon corporations created by them, such as railroads, plank roads, and mining companies. The briefs of counsel refer to them, and we will not repeat the citations. Without exception, they provide for reports from which the amount of taxes was computed. Other recognized specific taxes, such as taxes upon brokers, peddlers, etc., were included in chapter 21 of the Revised Statutes. It even seems to have been thought advisable to distinguish duties from them. Accordingly the title mentions them, and the chapter (21) imposes *ad valorem* duties upon property sold at auction, and spirituous liquors. In view of these laws, some of which continued in force after the adoption of the Constitution, we are satisfied that the convention understood the meaning of the term "specific taxes," and used it in no other than the common and well-settled sense of the term, which they understood to imply a tax which was made specific in rate and arbitrary in its standard, requiring no assessment beyond a mathematical computation. Of such taxes, Mr. Cooley says:

"License taxes, and other taxes on business or occupations, stamp taxes, taxes on franchises and privileges, are usually specific, as are also other excise and customs taxes. As regards all such taxes, the law by which they are laid is of itself a complete apportionment. Ministerial officers have nothing to do but to list the subjects of taxation; classify them, where that is necessary; ascertain the number, weight, measurement, etc., when taxation depends upon it; and collect the sum which the law has definitely fixed. If the taxes are stamp or license taxes, even the

listing may not be required, but the individual who is to pay them will purchase his stamp or his license, and thus make voluntary payment, as he may have occasion." Cooley, Tax'n (2d Ed.), 238.

If the tax in this case is clearly an *ad valorem* tax, if it is a tax on property,—and this cannot be questioned, because the title and the act both call it a tax on telegraph lines, which are property,—there is nothing in the law to indicate that an occupation tax or tax upon business was intended, even were we to hold that its *ad valorem* feature would not necessarily preclude its being denominated a specific tax.

It follows that the auditor general should not treat this as a specific tax, by crediting it to the educational fund.

It remains to inquire whether this tax can be sustained as an *ad valorem* tax. We have seen that the Constitution requires uniformity in taxation, except as to property specifically taxed. Not being a specific tax, this must comply with this requirement, which it can hardly be said to do. It is to be assessed according to cash value, which is a compliance with section 12; but if assessment as a whole, and not locally, and by a state board, and not by a local board, as in ordinary cases, can be said to be permissible,—which we do not decide,—the fact remains that the rate is determined in a different way, and is different in amount, from taxes imposed upon other property which contributes to state taxes. We must infer that this is a state tax, for it is payable to the state treasurer, and the law does not provide for its application to local purposes. The taxes generally assessed for the State bear a proportion to the amount to be raised, and all taxable property, except that paying specific taxes, is charged with a given and equal per centum upon its assessed value. That cannot be said of this property, for the rate is to be the average of all taxes raised for all purposes,—local as well as state. It is not a specific tax, and it is not within the uniform rule of taxation prescribed for other property, and the law providing for it must therefore be held void.

Counsel urge that this statute has been a law since 1879 (Act No. 77, Pub. Acts 1879), recognized by the departments as valid, and acquiesced in by the corporations taxed under it, and by the public, and ask us to apply to this case the doctrine that "long and continued usage furnishes a contemporaneous construction which must prevail over the more technical import of words." This principle should be applied more cautiously to constitutions than to laws. The inference that the public is satisfied with a construction of a law giving it an effect which the legislature might have lawfully provided, and which would not be disputed had its language shown an intent to do so, is much greater than in the case of a constitutional provision, where the question arises, not in regard to legislative intention, but to legislative power. And, if we could eliminate this distinction, the ability to easily change the law by legislative action would give more force to a construction in conformity to usage than would be justified in the case of a constitutional provision, which cannot be so readily altered. It is a rule which should not be applied except in cases of doubt. Mr. Cooley, in his Constitutional Limitations (6th Ed., p. 85), says:

"Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the constitution, and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period, in violation of the constitutional prohibition, without the mischief which the constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the constitution. We think we allow to contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve in its own favor the doubts which arise on reading the instrument to be construed."

The rule of contemporaneous construction was applied

in the case of *McPherson* v. *Blacker*, 92 Mich. 377 (16 L. R. A. 475, 31 Am. St. Rep. 587), where the question was what was meant by the language of the Federal Constitution which provides that—

"Each State shall appoint, in such manner as the legislature thereof may direct, a number of electors equal to the whole number of senators and representatives to which the State may be entitled in the congress."

The opinion in that case, and in the case of *City of Detroit* v. *Chapin*, 108 Mich. 136 (37 L. R. A. 391), review the authorities sustaining that rule. In the latter case it was held that the question must be a doubtful one, to permit contemporaneous construction to have weight.

Again, this usage has not the force that it would otherwise have, because the law was not passed until nearly 30 years after the adoption of the Constitution. To apply this principle would be to hold, in substance, that the practical construction of a department, acquiesced in by those affected by the law, possibly satisfied with it because of the favorable consideration that it gives them, has made necessary or proper a construction of the Constitution, upon a most important subject, which, in the absence of the practice under it, would not be indulged.

The applications must be granted,—that of the telephone company, as prayed; that of the governor, to the extent of requiring the amount collected under the law, and now in the hands of the treasurer, to be credited to the general fund. Costs will not follow.

The other Justices concurred.

Montgomery, J. I concur in the opinion of Mr. Justice Hooker. I think it cannot be maintained that a tax on property based on assessment is a specific tax. The definition of "specific tax" stated by Judge Cooley is a tax which "imposes a specific sum by the head or number, or by some standard of weight or measurement, and which requires no assessment beyond a listing and classi-

fication of the subjects to be taxed." Cooley, Tax'n (2d Ed.), 238.   It is true, the capital stock of a corporation may be made the basis of the levy of a specific tax or franchise tax, but this is a method of measuring the tax without resort to assessment.   In Burroughs, Tax'n, 168, referring to the federal decisions on the subject, the author states:

"When the tax is on the nominal capital of a bank, without regard to the value of the property of which it is composed, such a tax is annexed to the franchise as a royalty for the grant, and is a tax on the franchise, and not on the property."

But the Supreme Court of the United States, in *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 195, 226, in speaking of a tax imposed under the Nichols law of Ohio, which is, in this respect, similar to the statute involved in this case, say, "The taxation is essentially a property tax."   So, in *State* v. *Jones*, 51 Ohio St. 492, the court labored to show that the tax under the Nichols law was a property tax; *i. e.*, that the good will enhanced the value of the taxable property, and might be considered, in assessing the value of the property, as property.   It was said:

"If, by reason of the good will of the concern, or the skill, experience, and energy with which its business is conducted, the market value of the capital stock is largely increased, whereby the value of the tangible property of the corporation, considered as an entire plant, acquires a greater market value than it otherwise would have had, it cannot properly be said not to be its true value in money, within the meaning of the constitution, because good will and other elements indirectly entered into its value."

The authoritative decisions under the Nichols law (*i. e.*, that of the Ohio supreme court and that of the federal supreme court) both rest upon the ground that the tax imposed was a tax on property, and not a tax on franchise or privilege.

The distinction between a franchise tax and a tax

on property is well illustrated by two decisions of the federal supreme court. In *People of New York* v. *Commissioners of Taxes*, 2 Black, 620, it was held that, as a tax on the national securities cannot be levied by a state or local municipality, the same result could not be reached by taxing the value of the stock of a bank which was wholly invested in such securities. But in the case of *Provident Institution* v. *Massachusetts*, 6 Wall. 611, the court had under consideration the statute of Massachusetts which provides for a tax on the average amount of deposits standing on the books of the institution. The court held this a tax on the franchise, and not a property tax. Referring to the case of *People of New York* v. *Commissioners of Taxes*, the court said:

"The statement of that case shows that the assessment was made under a then recent law of the State, which required the tax to be imposed upon a valuation of the stock, like the property of individual citizens, and not, as formerly, on the amount of the nominal capital, without regard to the depreciation. The prior system of taxation in that State was different, and this court admits that, according to that system, it was immaterial as to the character or description of the property which constituted the capital, as the tax was one annexed to the franchise as a royalty for the grant, and was imposed wholly irrespective of the character of the property."

In *Hamilton Manfg. Co.* v. *Massachusetts*, 6 Wall. 632, the court went still further. There the tax was assessed upon the excess of the market value of the capital stock over the assessed value of the real estate and machinery of the corporation. The court held this to be a tax on franchise, and not on property. So, in the same case, the supreme judicial court of Massachusetts had reached the same result. The reasoning by which the result was reached is shown by reference to the opinion of the court in *Com.* v. *Hamilton Manfg. Co.*, 12 Allen, 302. The court say:

"The statute does not require that there should be any return made of the personal property held by corporations

to the board of commissioners who are to fix the amount on which the assessment is to be reckoned; nor is there any valuation or estimate of such property to be made in order to arrive at the amount of the excise or duty."

In the same opinion the court say:

" It certainly cannot be contended that the legislature can legitimately impose a tax on property in the name or under the guise of levying an excise or duty.   Such legislation would be a palpable evasion of a distinct and clearly-defined constitutional restriction, and would substitute an unequal and arbitrary system of taxation upon property for one which was intended by the constitution to be equal and proportional."

In no case to which my attention has been called has a tax imposed on the property of a corporation at a valuation fixed by assessors been treated as a tax on a franchise, as distinguished from a tax on property.   The case last cited comes the nearest to so holding of any, and this makes the market value of the shares the basis, and distinctly negatives the right to so treat a valuation fixed by assessment.   The case of *Bailey* v. *Fuqua*, 24 Miss. 497, distinguishes between a specific and an *ad valorem* tax. The test adopted is whether the tax is assessed on value, and, as the statute under consideration so provided by clear implication, it was held not to provide a specific tax. See, also, *City of Brookfield* v. *Tooey*, 141 Mo. 619.

It is contended, however, that the specific taxes provided for in our Constitution may be taxes on property, and that this implies that they may be assessed upon value. I do not think the latter proposition is necessarily a sound deduction from the former.   The exception from the rule of uniformity provided by section 11, of property paying specific taxes, does necessarily imply that specific taxes may, in one sense, be laid upon property.   In one sense, specific taxes are laid on property when the capital stock of the corporation, or its gross earnings, is made the basis for a levy; and yet, as we have seen, taxes so levied are specific taxes, or taxes on the franchise, within accepted definitions.

The argument made that the statutes in force when the Constitution was adopted, and which were continued in force, provided for taxes on property which were by the Constitution treated as specific taxes, is sufficiently answered by my Brother HOOKER. As pointed out by him, none of these acts provided for an assessment on the property according to value, but the rate was fixed and calculated on the basis of capital invested, without regard to depreciation.

Is the tax imposed uniform with that imposed upon other property bearing the same relation to the State? Treating the tax imposed as one on property, based on valuation, and not as a specific tax, the corporations and associations mentioned in this act can no more be discriminated against, as to the assessments made or taxes exacted, than can merchants, manufacturers, or farmers. The tax levied in this act is the average rate of all taxes levied by the State, counties, and municipalities throughout the State. A telephone company in Tecumseh, where the local taxation added to the state tax may not exceed $1\frac{1}{2}$ per cent., may, under this act, be required to pay $2\frac{1}{2}$ per cent. Under the Atkinson bill, a railroad in the Northern Peninsula is required to pay the same rate as one having a terminus in Detroit, and extending through territory in which local improvements are expensive, and schools are maintained at great cost.

GRANT, C. J., MOORE and LONG, JJ., concurred with MONTGOMERY, J.

GRANT, C. J. I concur in the opinions of my Brothers HOOKER and MONTGOMERY, but desire to express my views somewhat more fully. Our Constitution authorizes only two kinds of taxes,—one, specific, imposed without regard to the value of the thing taxed; the other, general, based upon assessed cash value, and requiring uniformity. The principal question for determination is, Is the tax imposed by this act a specific tax? If it is a specific tax, the act is valid; if it is not a specific tax, it is void, for non-

compliance with section 14, art. 14, of the Constitution, which provides that "every law which imposes, continues, or revives a tax shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object." This law does not provide the object to which the tax is to be applied. This is so obvious that I spend no time in discussing it. When a tax is specific, the Constitution fixes the object to which it is to be applied.

It appears to me impossible to read the definitions of the lexicographers and the decisions of the courts without reaching the conclusion that the terms "specific tax" and "*ad valorem* tax" have a well-defined meaning; and in the Constitution of this State, as well as in the statutes and decisions, these definitions are clearly recognized. Concise definitions are given in 25 Am. & Eng. Enc. Law, 17, notes 2, 3, and Cooley, Tax'n (2d Ed.), 238. As these are found in the opinions of my brothers, I will not restate them. These two definitions are, in substance, the same as given by other authorities, both legal and lay. A tax based upon the assessed cash value of the property assessed is not a specific tax. It is an *ad valorem* tax, and any enactment by a legislature that it is a specific tax does not make it so; otherwise, the legislature could determine what was meant by the use of terms in the Constitution which have a well-defined meaning. The fact that, in imposing a specific tax, the value of the thing taxed is taken into consideration in determining the amount of it, does not change the nature of the tax. A tax upon the capital stock of a corporation, paid or unpaid, or upon its bonds issued or money borrowed, is just as much a specific tax as is so much per article upon the thing produced. The real value of the capital stock is not its par value. It would probably be safe to say that there is not a corporation in this State whose stock, paid or unpaid, at its par value, is its real value, or whose indebtedness in money borrowed represents its value. It is a well-known fact that the actual value of many of our mining corpora-

tions is many times greater than the par value of the stock, while that of others is many times less than the par value. So a tax upon the bonds or upon the borrowed money of a corporation is not a tax upon the value of the corporation. The next day the money borrowed may be put into improvements which will increase the real value of the property much greater than the amount borrowed, while in other instances it will be a loss. All such taxes are not taxes upon value, but upon the specific thing, regardless of its real value.

It is undoubtedly true, as argued by the learned counsel for the respondent, that value enters into every specific tax. The people do not tax, specifically or otherwise, worthless property. Probably the specific tax on a ton of copper or silver would be placed at a much higher sum than a tax upon a ton of iron; but this fact does not change the nature of the tax. I speak of this because it is argued that when the framers of the Constitution, in section 10 of article 14, provided: "The State may continue to collect all specific taxes accruing to the treasury under existing laws. The legislature may provide for the collection of specific taxes from banking, railroad, plank-road, and other corporations hereafter created,"—they used the term "specific" with reference to its meaning in the laws as they then existed. This is conceded to be correct; and Messrs. Hanchett and Pond, who, at the request of the governor, have appeared as counsel for the relators, also argued that the term was so used in all laws prior to the adoption of the Constitution of 1850, where a tax upon value was understood to be a specific tax. We have examined all the laws referred to, and we do not find that in any single act passed prior to 1850 is there any language to justify the conclusion that the term "specific tax" was used to apply to an *ad valorem* tax, as in the act under discussion. In all these acts,—and there were many,—the only thing to be done was for the ministerial officer to list the property, and the law stepped in and determined the tax. There was no officer of the State

appointed to assess the value. The real value was wholly immaterial, and not to be considered. The money borrowed might be invested profitably or unprofitably. The tax was on the specific thing, and not upon value. This is the criterion to determine whether the tax is specific or *ad valorem*. There is nothing, therefore, in these acts, to show that the legislature had ever intended to impose a specific tax upon an *ad valorem* assessment. On the contrary, we think the plain conclusion is that the framers of the Constitution used these terms within the definitions above given.

In *Bailey* v. *Fuqua*, 24 Miss. 497, the court say:

"The term '*ad valorem* tax' is as well defined and fixed as any other used in political economy or legislation, and simply means a tax or duty upon the value of the article or thing subject to taxation."

It is stated by one of the learned counsel for the relators, in his brief, that the specific taxes levied prior to the adoption of the present Constitution were not, with possibly one exception, levied upon an assessed value. That exception, I suppose, was under the law approved April 25, 1846; being an act declaratory of the interests of the State of Michigan in mines and minerals. Section 4 of that act (being section 2557 of the Compiled Laws of 1857) provided for a "specific tax of 4 per cent., to be in lieu of all other state taxes, * * * to be assessed thereon upon the average yield and value of such ores." This is called a specific tax in the law, and is a specific tax, being a tax upon the specific article produced, and recognizes a proper principle in specific taxation, viz., that of considering value an element in fixing the amount. But there was no attempt to assess and tax the entire property of the company. A specific tax may be so much per pound, or so much per dollar upon the value, of the article produced. In neither case is any attempt made to assess and tax all the property of the corporation.

In *Walcott* v. *People*, 17 Mich. 68, at page 90, Justice

CAMPBELL, in a dissenting opinion, after referring to sections 11 and 12 of article 14, says:

"Taking these sections together, and reading them according to their natural construction, the conclusion seems unavoidable that taxation by an assessed valuation of property must be the rule, and specific taxation the exception."

The points in that case upon which the court disagreed were (1) whether the power given by the Constitution to continue specific taxes, and to impose specific taxes on corporations thereafter created, limited the right of specific taxation to such cases, or left the legislature at liberty to apply it to other branches of business; (2) whether it was repugnant to that clause of the Federal Constitution which gives congress the power to regulate commerce among the several States. That case was referred to in *Kitson* v. *Mayor, etc., of Ann Arbor*, 26 Mich. 325, which again recognizes the two classes of taxation permissible under our Constitution,—the one, an assessment upon the property at its cash value; and the other, specific taxes not based upon value.

Both an *ad valorem* and a specific tax may be imposed. *State* v. *North*, 27 Mo. 464, upheld an *ad valorem* tax on the goods of merchants, and also a tax on their occupation, to be collected in the form of a license.

In *City of Brookfield* v. *Tooey*, 141 Mo. 619, an ordinance of the city levied a license tax of 1 per cent. per annum upon the cash value of the stocks of merchants. The court held that this was a property tax, pure and simple, and that to call it a tax upon occupation was a misnomer. It was held to be void because not uniform upon all the personal property of the city, in that it levied $1 upon every $100 of assessable personal property belonging to a merchant, and exempted all personal property not belonging to merchants from such tax. So, in *State* v. *Switzler*, 143 Mo. 287 ( 65 Am. St. Rep. 653 ), a succession tax levied upon the appraised value of the whole estate left by the deceased, to be paid by the personal

representatives, was held to differ in no particular from a general tax upon property, and to be void because it violated the constitutional requirement of uniformity. In *Maine* v. *Grand Trunk R. Co.*, 142 U. S. 217, the statute required every railroad in the State to pay to the State an annual excise tax for the privilege of exercising its franchises in the State; the amount to be determined by the gross transportation receipts of each corporation, person, or association. No question of specific or *ad valorem* taxes was involved. The constitution of Ohio (article 12, § 2) required that laws should be passed taxing by a uniform rule all moneys, credits, investments in bonds, stocks, joint-stock companies, or otherwise, and also all real or personal property, according to its true value in money. It also provided (article 12, § 3) that the general assembly should "provide by law for taxing the notes and bills discounted or purchased, moneys loaned, and all other property, effects, or dues of every description (without deduction), of all banks now existing or hereafter created, and of all bankers, so that all property employed in banking shall always bear a burden of taxation equal to that imposed on the property of individuals." The legislature provided for different modes and agencies to determine the true value of property liable to assessment. This law came before the supreme court of Ohio in *Wagoner* v. *Loomis*, 37 Ohio St. 571. The result of the law was an unjust discrimination against banking companies, but this was held to be the fault of the assessing officers, and not of the law. If the officers had performed their duty, the assessment would have been as nearly equal as human judgment could make it.

A statute of the State of Maine provided that every telegraph corporation, company, or person should annually pay into the state treasury a tax of 2½ per cent. on the value of any telegraph line owned by said corporation, company, or person within the limits of the State, including all poles, wires, insulators, office furniture, batteries,

120 MICH.—8.

and instruments, and any circumstances or conditions which affected the value of the property. The second section of the act provided for a return to the secretary of state, to be made under the oath of the superintendent of the company. The governor and council were then required to determine the valuation and assess the tax. The telegraph company claimed that the act was void, under article 9, § 8, of the constitution of Maine, which is as follows: "All taxes upon real and personal estate assessed by authority of this State shall be apportioned and assessed equally, according to the just value thereof." The opinion concedes that, if the act imposed a tax upon property, it was void, and then proceeds to demonstrate that it imposed a "tax or excise upon a specific use of the property, and therefore was not within the limitation of the constitution." The opinion states that the law does not cover all the property of the company, and concludes that the purpose was to levy a tax upon the use or business of the company, and that in reality such was the tax imposed. *State* v. *Telegraph Co.*, 73 Me. 518. I do not wish to be considered as assenting to the reasoning of that case. It seems to me a fair deduction from reading the act, which is given in full in the opinion, that the intention was to cover all the property of the company, and put a tax upon the valuation of all its property; but the court held otherwise, and that is the distinguishing feature of the case. In determining the character of this tax, the court say:

"The name is not material. It is the nature of the tax imposed which settles the question as to its validity. If the tax is upon the property as such, it is illegal, by whatever name we may christen it. If upon the franchise, it is clearly within legislative power, though the name be omitted, and though the value of the franchise may be ascertained by an estimate of certain property."

The title of the act here in question is, "An act to provide for the assessment and taxation of telegraph and telephone lines within the State of Michigan," etc. Section 3 of the act requires the board to assess "said telegraph and

telephone lines at the true cash value thereof." If our statute includes all the property of the company, and imposes an *ad valorem* tax upon it, then the Maine case supports the contention of those attacking the validity of the act.

The evident design was to place this property upon an equality, so far as possible, with other property of the State, to make it bear its fair share of the public burdens. The act has none of the features of a specific tax. We are not now concerned with the question whether the appointment of a board to assess the property of these corporations is valid. Some of the authorities already cited support it. So, also, do *Central Iowa R. Co.* v. *Board of Sup'rs*, 67 Iowa, 199; *County of Franklin* v. *Railway Co.*, 12 Lea, 521. I see no objection to this mode of assessment, when the design and effect of the law are to place the property of these corporations upon the same basis as other property of the State.